STATE OF WEST VIRGINIA *v.* LEMON HAMRICK

(No. 7276)

Submitted March 24, 1932.   Decided April 19, 1932.

*G. G. Duff* and *J. D. Alderson,* for plaintiff in error.

*H. B. Lee,* Attorney General, *W. Elliott Nefflen,* Assistant Attorney General, and *Emmett Horan,* for the State.

WOODS, JUDGE:

Lemon Hamrick, who was sentenced to life imprisonment for the murder of Claude Hamilton, a deputy sheriff of Nicholas County, brings error.

It appears that the sheriff's office was in possession of information that Hamrick had been selling moonshine liquor, and that he had made a sale to one Rader, on Wednesday morning, October 21, 1931. On the evening of the 21st, Claude Hamilton, together with W. B. Coleman, a member of the department of public safety, and W. C. Smith, a representative of the state prohibition department, armed with a warrant, which called for the arrest of Lemon Hamrick, and also for the search of certain premises and the arrest of all present thereat should contraband be found, proceeded to a point along the Craigsville Road some two thousand feet above the ferry over Gauley at its confluence with Cherry River, and about two hundred yards below defendant's home. They stationed themselves some twenty-five feet above the road, and along the path leading from the road to defendant's home. Hamilton was on the left, facing the road, Coleman on the right—the two being some 38 feet apart. Smith was some distance up the path. Rader, who had bought liquor that morning, went to the home of Hamrick about 11 o'clock and negotiated a sale, stating that he would have to cash a check before making the purchase, and would meet defendant at the ferry. Thereupon, Rader advised the officers that Hamrick would be along in a short while. Hamrick came down the path to the point directly opposite Hamilton and Coleman. According to Smith, Hamrick was carrying a flashlight in one hand and a revolver in the other at the time he passed him. The evidence of the state from this point to the time Hamilton fell mortally wounded is to the effect that when defendant was on line with Hamilton and Coleman, he apparently saw the former

for he, at that time, turned his flashlight in that direction and covered Hamilton with his revolver. Thereupon, Coleman arose and cried out: ''State police, drop your gun.'' At this, defendant wheeled and fired on Coleman, who fell to avoid injury. Hamilton sprang upon the defendant, and the two men struggled down toward the county road, followed closely by Cooper and Smith. A shot or two was fired. Hamilton fell, and died shortly thereafter. The pistol carried by Hamilton had one empty chamber; Coleman admitted firing three shots at defendant after Hamilton had fallen. Smith fired no shots. A lead bullet was taken from Hamilton's spine later in the night, and was on the morning following turned over to the sheriff.

Defendant admitted having a revolver on his person, but denied having it in his hand as he came down the path. He denied firing at Coleman. He did admit, however, that he fired one shot from a 38-caliber revolver while grappling with Hamilton. He states that Hamilton rushed him; that he ran; that just before Hamilton jumped on his back two shots were fired; that he (defendant) fired the third shot; and that three or four other shots were fired thereafter. He testified that he did not know that the parties met along the path were officers of the law; that they never said anything to him; that he did not know whether or not he struck anybody with the shot he fired; that he ''kind of hid'' the revolver.

Defendant was apprehended at Clarkeburg ten days after the affray. An empty shell, the caliber of which corresponded with the bullet taken from Hamilton's spine, was found on the defendant's person at the time of his arrest. It also appeared that the revolvers carried by the officers shot only 38 special ammunition.

Primarily, the defendant urged as error the refusal of the court to continue the case. It is a time-honored rule of procedure in criminal cases that the granting or refusing of a motion for a continuance is in the sound discretion of the trial court; and that this court will not interfere with the exercise of this discretion unless the action of the trial court is plainly erroneous and is a clear abuse of its dis-

cretion. We find nothing in the record indicating an abuse of this power.

The other points of error urged in this court relate to the question of entrapment, certain remarks made by the court during trial, the giving and refusing of instructions, and the lack of evidence to justify the verdict of the jury.

The plaintiff in error cites the case of *Butts* v. *United States*, 273 Fed. 35, wherein it was held that it is not the duty of a government official to incite to and create crime for the purpose of prosecuting and punishing it. In that case, however, it is not denied that, in cases where the criminal intent originates in the mind of the defendant, the fact that the officers of the government used decoys or untruthful statements to furnish opportunity for or to aid the accused in the commission of a crime, in order to successfully prosecute him therefor, constitutes no defense to such a prosecution. The foregoing is upheld by a multitude of federal cases cited in that opinion. But, whatever the doctrine may be in other jurisdictions, we are bound in this State by the case of *State* v. *Jarvis*, 105 W. Va. 499, 143 S. E. 235. We there held that when the only inducement offered by an officer to promote a sale of liquor is willingness to buy, the doctrine of entrapment is not available to the seller. The whole question of entrapment is thoroughly discussed in the *Javis* case, and is summarized by the following words taken from the opinion: "A clear distinction is to be drawn between a deception practiced to detect crime and one which creates crime." The purpose of the deception in the instant case was obviously not primarily to incite an offense, but to ascertain whether the defendant was engaged in an unlawful business. This purpose is held to be a sufficient answer to the argument that the act was done at the instigation of an agent for the State. So, after discussing the decisions relating to entrapment, in an annotation in 18 A. L. R., 146, 162, the conclusion is drawn by the author that "the great weight of authority supports the view that a person making an unlawful sale of liquor is not excused from criminality by the fact that the sale is induced for the sole purpose of prosecuting the seller." According to the

case under consideration, that was the sole purpose of the officers in sending Rader to the house of the defendants to purchase intoxicants.

The question of entrapment was pressed by counsel for the defendant at the trial. The presiding judge in passing upon the question used the following remarks: ''I can't see that that is very material. Taking it from the standpoint of the· defendant, if he had whiskey and was doing what he did voluntarily, it woudn't be material that someone trapped him. As I stated yesterday, sometimes that is the only way the officers of the law can cope with criminals; and looking at it from another point of view they would have a legal right to do that, and that would not be any defense. The only claim that it would·come in under at all probably it would be admissible to show the interest of these officers as witnesses. I am doubtful as to whether it would have any· place for that purpose, but I am giving you the benefit of the doubt.'' The foregoing remarks of the court were excepted to, and urged here as error. Considering the setting, we do not concur in this construction. The remarks of the court were plainly induced by the insistence of counsel that the conduct of Rader in going to the home of Hamrick was such entrapment as is forbidden by the law. It will be seen that the holding of the court was in direct conformity to the law on this question, as laid down in the *Jarvis* case. The words of the court's ruling—''As I stated yesterday, sometimes that is the only way the officers of the law can cope with criminals''—are stressed mainly. In their ·proper setting in the charge we do not think that they amount to error. The minds of intelligent jurors would not be swayed by remarks of the court in the course of an opinion ruling on proffered testimony. The judge was speaking in a general way of the question of entrapment, and it would be straining the point to claim that the remarks complained of related personally to the person on trial. The defendant was clearly within his rights in pressing the question which demanded a ruling from the court. He did not request that the jury be retired for the purpose of securing such ruling, in their absence. Since the trial judge is not only permitted, but

it is his duty, to participate directly in the trial and to facilitate its orderly progress, his remarks or conduct in performing this duty will not constitute error if they are such as do not discriminate against or prejudice the case of the accused. The court evidently went as far as he could in allowing all the evidence relating to the question to go to the jury as effecting the credibility of the witnesses. This course, according to the record, continued throughout the entire trial.

The state submitted fifteen instructions, fourteen of which were given; and of the thirty-four requested by defendant, thirteen were refused. They are so numerous and lengthy that it is impossible to discuss them seriatim in this opinion. A great many of those given correspond to the usual instructions in criminal cases. The state's instructions are those offered and approved in trials for murder. Practically the only objection urged against them on the hearing was that the evidence did not warrant instructions involving murder in the first degree. The twenty-one instructions given for defendant placed his case fairly before the jury. Those refused by the court relate mainly to matter contained in other instructions. Zealous counsel in an endeavor to present their client's case as fairly as possible, aimed to give the same principles in different phraseology. To give such instructions rests in the discretion of the trial court, and their refusal has often been held not to be error. But, aside from those instructions of the foregoing class, there is one that may be noted. It relates to a case where circumstantial evidence in whole or in part may be relied upon by the state but its vice is that it is a binding one. The state offered no instruction on circumstantial evidence. It is a well established rule of law that an instruction cannot take only a portion of the facts involved in a case under the evidence, and erect a hypothesis upon them only, disregarding others, and tell the jury if that hypothesis be true, to find accordingly, because that hypothesis is not as broad as the scope of the evidence before the jury.

The crux of the case, so far as the state is concerned, is embodied in its instruction No. 8, which is as follows: "The

court instructs the jury that if you believe from the evidence in this case, beyond all reasonable doubt, that the defendant armed with a dangerous and deadly weapon was engaged in the commission of a misdemeanor, or other unlawful act, and was apprehended by the officers of the law while so engaged, and that he knew they were officers, and that he fired the shot with malice and intent to kill, at one of the officers and thereupon the deceased took hold of or attempted to hold the defendant and a scuffle or combat ensued, between the defendant and the deceased, that he would be guilty of murder and could not rely upon self defense as justification if the jury believe that the danger to the defendant, if any, was caused by his own misconduct and from his malice and intent to kill.''

On the other hand, defendant's version of the affair is very fairly presented in his instruction No. 20, viz: ''The court further instructs the jury that if they believe from the evidence in this case that the defendant Lemon Hamrick came down the path in the nighttime from his home at the time and place mentioned to the intersection of the path and the road where Claude Hamilton and other officers were hid in the brush for the purpose of effecting his arrest, and none of said officers informed him that they held a warrant for his arrest, and that he did not know that they were there for the purpose of arresting him, and that by reason of the darkness he could not discern who they were, and that Claude Hamilton attacked him for the purpose of arresting him, and that he apprehended that they meant to do him some great bodily harm or take his life and that there were reasonable grounds for believing the danger imminent and that such design would be accomplished, and that he did so believe and fear that such design would be accomplished then he may have acted upon such appearances and in attempting to make his escape he killed Claude Hamilton, one of his assailants, and that he had reasonable grounds to believe and did believe that such killing was necessary in order to avoid the apparent danger, then the killing under such circumstances is excusable although it may afterwards turn out that the appearances were false.''

The main question was who shot Hamilton. The defendant sought to show, and it was admitted, that a number of shots were fired. The defendant's revolver was not found, but a shell was found in his pocket. The body of Hamilton was taken to an undertaking establishment in Richwood shortly after the shooting; Dr. Brown, in the presence of the mortician, made an examination of the wound and probed for and found a lead bullet from a short 38 cartridge, imbedded in the spinal column. Both of these parties stated that this bullet was handed over to a man by the name of Grose with instructions to give it to the sheriff. This was on Wednesday night. Grose testified, and sheriff also, that he received the ball tied up in bloody paper the next morning. Upon hearing that either the mortician or the doctor had said it was a steel jacketed ball, the sheriff called both into his office the same week, at which time they made a further examination of the ball, which they identified, determining that it was a lead bullet. The mortician, the doctor, Grose, and the sheriff all identified the ball which was admitted in evidence without objection. It was shown that Hamilton, Smith and Coleman were all armed with 38 special caliber revolvers. A number of experts on fire arms showed the bullet coming from the body of Hamilton could not have been fired from either of the revolvers carried by the officers on the night of the homicide. The defendant admitted that the revolver he carried was similar in caliber to the shell found in his pocket. He admitted shooting during the melee in which Hamilton was killed. Thus it seems conclusive that the bullet taking the life of Hamilton must have come from the revolver carried by the accused. Doubt was sought to be cast upon this proposition by counsel for the accused on the hearing. They pointed to the statement made by the mortician shortly after the examination that it was a steel jacketed bullet, and sought to infer that the bullet had been switched to meet the occasion. This claim is robbed of its effect and value when it is considered that the accused had not been apprehended, nor the presence of the empty shell in his pocket known, at the time that it was definitely determined that it was a lead bullet.

Was the evidence sufficient to justify a verdict of first degree murder? As already shown, the defendant, according to the state's evidence, upon seeing Hamilton to his left, covered him with a revolver, which he was carrying in his hand, and, upon the command from Coleman, "State police, drop your gun," wheeled and discharged the weapon at the latter. It was only then that Hamilton, his revolver still in its holster, sprang to his feet and grabbed the defendant. Up to this time, neither Smith nor Coleman had drawn his revolver. After grappling down the mountainside for some seventy feet, Hamilton fell, and the accused jumped over the bank into the brush, making his escape. At that time officer Coleman fired three times at the fleeing man. Smith testified that shots were fired at the time Hamilton fell. The prisoner admitted on the trial that he shot, but only for the purpose of scaring Hamilton. Upon being asked to describe their positions at the time of the firing, he said he merely fired backward toward Hamilton as he was endeavoring to extricate himself from Hamilton's grasp. Considering the nature of the terrain at the place where this scuffle occurred, and the range of the ball in the body of the deceased, it seems wholly improbable that this shot which took Hamilton's life was fired in the manner maintained by the accused. Here we have an accused in the midst of a violation of the law, armed with a deadly weapon, beginning the attack upon officers of the law, who are sitting by the side of the road, engaged in no overt act toward the accused. While the attack is being made on one of the officers, another officer acquainted him that they were such officers, and demanded that he drop his gun. True, the accused denies the latter statement. However, when pressed on cross-examination at the trial as to whether he knew that the men were officers, he responded, "I figured it was though." Whether malice exists in a particular case is usually a question for the jury, and although in perfectly clear cases, the courts have held that the evidence was not sufficient to show malice even where the jury has found to the contrary, yet malice is a subjective condition of mind, discoverable only by words and conduct,

and the significance of the words and conduct of an accused person, wherever there can be doubt about such significance, addresses itself peculiarly to the consideration of a jury. This court said in *State* v. *Porter,* 98 W. Va. 390, 127 S. E. 386, that "It is well settled that, if intent to take life is executed after deliberation and premeditation, though but for a moment or an instant, the crime is murder in the first degree." Or again, as in *State* v. *Panetta,* 85 W. Va. 212, 101 S. E. 360, it "may spring into the mind of the accused at the very instant of the commission of the act." In numberless decisions we have held that whether or not such malice existed is for the jury. "The jury are the judges of the degree of crime." *State* v. *Banks,* 99 W. Va. 711, 129 S. E. 715. The jury in this case, while finding the accused guilty of the highest degree of murder, has shown leniency, doubtless taking into consideration the youth of defendant, by fixing his punishment at confinement in the penitentiary. In obedience to their solemn oath, after hearing all the testimony, observing the demeanor of the witnesses, they have so found him guilty. A learned judge approved this finding. We cannot interfere.

*Affirmed.*