400 S.E.2d 230

**Patricia DAVIS, Administratrix of the Estate of Bryan M. Davis**

v.

**Dr. Hsinn–Hong WANG, Dr. William Neal, Dr. Brian Arthurs, West Virginia University Hospitals, Inc., and West Virginia Board of Regents.**

**No. 19040.**

Supreme Court of Appeals of West Virginia.

Dec. 4, 1990.

Linda M. Bordas, David A. Jividen, James G. Bordas, Jr., Bordas & Bordas, Wheeling, for Patricia Davis.

Herbert G. Underwood, Steptoe & Johnson, Clarksburg, for Dr. William Neal, Dr. Brian Arthurs, and WV Bd. of Regents.

Don R. Sensabaugh, Jean Buckley, Kay, Casto & Chaney, Charleston, for WV University Hospitals, Inc.

BROTHERTON, Justice:

This case involves an appeal by Patricia Davis from the October 23, 1987, jury verdict from the Ohio County Circuit Court, in which the defendants, Drs. Neal and Arthurs, the West Virginia University Hospital, and the West Virginia Board of Regents, were found to be not negligent in the death of her son, Bryan Davis.[1]

Bryan Davis was five months old when he was admitted to the Ohio Valley Medical Center on June 26, 1985, with a diagnosis of H-flu meningitis. After eleven days of treatment, Dr. Wang, Bryan's pediatrician, had the child transferred to the West Virginia University Medical Center (WVU) because the child's fever had not been resolved. Thus, on July 5, 1985, the child was admitted to WVU under the care of Dr. William Neal, the head of the Department of Pediatrics.

Upon admission, physicians made a differential diagnosis of H-flu meningitis and Kawasaki's disease. At that time, a second test for meningitis was performed, which was initially negative. A repeat test was weakly positive. Because of the positive meningitis test and the spinal fluid gram stain performed at the Ohio Valley Medical Center, combined with the child's other symptoms, Dr. Neal and Dr. Sikora, the Chief Pediatric Resident, made a diagnosis of partially treated meningitis. This diagnosis was confirmed by Dr. Melanie Fisher, an infectious disease expert who examined Bryan Davis at the request of the treating physicians. Bryan's condition gradually improved, until he was discharged from the hospital on July 16, 1985. He had a slight fever at the time of discharge.

Prior to his discharge, Bryan's grandmother, a nurse at a Moundsville hospital, discussed the child's condition with Dr. Ventosa, a pediatrician at the hospital where she worked. Upon hearing the child's symptoms and test results, Dr. Ventosa indicated a possible diagnosis of Kawasaki's disease. This diagnosis was made by Dr. Ventosa prior to the child's discharge from WVU Hospital. Two days

---

1. Dr. Wang settled with the appellant, Mrs.    Davis, prior to trial.

after the discharge from WVU, Dr. Ventosa, at the request of the parents, made an appointment to see Bryan Davis in his office on August 9, 1985. At that time, Dr. Ventosa told Bryan's grandmother that he believed the child had Kawasaki's disease and that she should bring him in right away if he wasn't doing well, but otherwise to wait until he had received the hospital records. No treatment was prescribed by Dr. Ventosa. No records were received, despite Mrs. Davis' request that they be sent. On August 9, 1985, Dr. Ventosa examined Bryan in his office and confirmed his diagnosis of Kawasaki's disease. The appellees claim that Bryan was healthy and well at the examination, and noted that Dr. Ventosa did not prescribe any treatment. Dr. Ventosa ordered an echocardiogram for the next day. However, Bryan Davis died that night. An autopsy diagnosed Kawasaki's Disease.

On March 11, 1986, Patricia Davis filed suit in the Circuit Court of Ohio County against Dr. Wang and the appellees, Dr. Neal, Dr. Arthurs, the West Virginia University Hospitals, Inc., and the West Virginia Board of Regents. Prior to the trial, the plaintiffs settled with Dr. Wang and he was released from this and any other claims arising out of the treatment and death of Bryan Davis.

The appellants contend that Bryan's doctors at WVU misdiagnosed him, ignoring signs that they believed were diagnostic of Kawasaki's Disease.[2] On October 19, 1987, this action was tried before a six-person jury. At that time, the Davises presented evidence that Bryan exhibited several of the symptoms necessary to diagnose Kawasaki's Disease.[3]

In contrast, the appellees contend that, while hospitalized at WVU Hospital, Bryan had certain signs which were consistent with Kawasaki's Disease, but not necessarily diagnostic of the disease.[4] Instead, they argue that the disease most strongly suggested by his condition was that of hemophilus influenza, a severe but common illness in infants. They argued that the child exhibited no evidence of any peeling of the fingers or toes, one of the basic symptoms, while he was hospitalized, and thus, they had no reason to suspect Kawasaki's Disease. In fact, they stated that Kawasaki's Disease had been considered, but ruled out.

At trial, the appellant moved to strike four jurors for cause. The court granted the appellant's motion for two jurors, but did not excuse the final two, Albers and Heyl. Juror Albers stated that she did not believe in damages for mental anguish, yet reluctantly stated that she would follow the law if so instructed. Juror Heyl testified that Steptoe & Johnson, the law firm which represented the defendants, had in the past done some work for his corporation, that his son-in-law was a doctor, and that his daughter and wife were nurses. He also testified that he had reservations about returning a damage award for pain and suffering. However, when asked if he would obey the law, he too stated that he would. Thus, the appellant used peremptory challenges to remove them from the jury.

2. A diagnosis of Kawasaki's disease is based upon a finding of five out of the following six symptoms: High fever, skin rash, redness of the mouth and lips that proceeds to cracking and crusting and is sometimes referred to as "strawberry tongue", conjunctival injection, peeling of the fingertips or toes, and an enlarged lymph node on one side of the neck. A high platelet count is also indicative of Kawasaki's disease.

3. The parents contend that the child had a high fever and rash upon transfer from Ohio Valley Medical Center. They state that Dr. Sikora noted a conjunctival injection upon physical examination. A medical student testified at trial that Bryan had peeling of his fingertips, and that she

had advised Dr. Arthurs, a resident on duty, of this fact. The parents note that Bryan showed an enlarged lymph node on the right side of his neck while he was at both Ohio Valley Medical Center and WVU Hospital. The child's mother and grandmother testified that Bryan also exhibited strawberry tongue. Finally, it was noted that the child's platelet count was well in excess of one million, which is characteristic of Kawasaki's Disease.

4. Treatment for Kawasaki's Disease in infants consists of high doses of aspirin. If treated, the mortality rate is only 0.5%. The fatalities generally result from damage to the heart.

On October 23, 1987, the jury returned a verdict for the defendants, in which none of the defendants were found to be negligent. Following the verdict, the Davises moved for a judgment notwithstanding the verdict, or, in the alternative, a new trial. On January 21, 1988, the Circuit Court of Ohio County denied that motion. This proceeding is the Davises' appeal from that final order.

On appeal, the appellants argue that the Circuit Court of Ohio County committed reversible error in not striking an allegedly biased juror for cause and because the court permitted the use of the *Dye v. Corbin* instruction. We agree and remand the case to the Ohio County Circuit Court for proceedings consistent with this opinion.

## I.

■ West Virginia Code § 56–6–12 (1966) defines the necessary qualifications of a competent juror and the basis upon which a potential juror should be struck:

> Either party in any action or suit may, and the court shall on motion of such party, examine on oath any person who is called as a juror therein, to know whether he is a qualified juror, or is related to either party, or has any interest in the cause, or is sensible of any bias or prejudice therein; and the party objecting to the juror may introduce any other competent evidence in support of the objection; and if it shall appear to the court that such person is not a qualified juror or does not stand indifferent in the cause, another shall be called and placed in his stead for the trial of that cause. And in every case, unless it be otherwise specially provided by law, the plaintiff and defendant may each challenge four jurors peremptorily.

In West Virginia, the test of a qualified juror is whether a juror can render a verdict based on the evidence, without bias or prejudice, according to the instructions of the court. Syl. pt. 1, *State v. Wilson,* 157 W.Va. 1036, 207 S.E.2d 174 (1974).

This Court has consistently recognized that the appearance and bearing of the juror in answering questions is of great importance and thus, the decision of the trial court as to his eligibility should control.[5] *State v. Toney,* 98 W.Va. 236, 127 S.E. 35, 36–37 (1925). Voir dire is designed to permit the parties to the trial to be informed of all relevant matters that may bear upon the potential disqualification of a juror. Thus, voir dire is essential to the fair and intelligent exercise of the right to challenge either for cause or peremptorily. *W.Va. Human Rights Commission v. Tenpin Lounge, Inc.,* 158 W.Va. 349, 211 S.E.2d 349, 353 (1975). *See also State v. Ashcraft,* 172 W.Va. 640, 309 S.E.2d 600 (1983). Moreover, voir dire must be meaningful in order for the parties to select a jury competent to judge and determine the facts without bias, prejudice, or partiality. Without a meaningful and effective voir dire, a fair trial is not possible. *Tenpin Lounge,* 158 W.Va. at 355–56, 211 S.E.2d at 353. *See also State v. Pratt,* 161 W.Va. 530, 244 S.E.2d 227 (1978).

■ However, the discretion granted the trial court in striking jurors for cause must be balanced against our determination, after the fact, of whether the potential jurors were sufficiently biased so as to prevent a fair trial. This Court has concluded that "the mere statement of a prospective juror that he or she is not biased with respect to a particular cause may not be sufficient for the trial court to conclude that no such bias exists."[6] *W.Va. Dept. of*

---

5. The decision as to whether to grant a motion to strike a juror for cause is within the sound discretion of the trial court. *See State v. Bennett,* 181 W.Va. 269, 382 S.E.2d 322 (1989).

6. In *W.Va. Dept. of Highways v. Fisher,* 170 W.Va. 7, 289 S.E.2d 213 (1982), *cert. denied* 459 U.S. 944, 103 S.Ct. 257, 74 L.Ed.2d 201 (1982), the Court quoted *State v. Pendry,* 159 W.Va. 738, 227 S.E.2d 210, 217 (1976), *overruled in part on*

*other grounds, Jones v. Warden,* 161 W.Va. 168, 241 S.E.2d 914 (1978):

> It may not always be sufficient merely to ask a juror whether he is sensible of any bias or prejudice and to accept either his denial or claim of bias or prejudice merely because he says it. The existence of bias or prejudice or other lack of qualification is addressed in the first instance to the trial court. Although the juror's opinion is entitled to consideration, it

*Highways v. Fisher*, 170 W.Va. 7, 289 S.E.2d 213, 218 (1982).[7] Moreover, in syllabus point 1 of *State v. Bennett*, 181 W.Va. 269, 382 S.E.2d 322 (1989), we held that:

> When individual voir dire reveals that a prospective juror feels prejudice against the defendant which the juror admits would make it difficult for him to be fair, and when the juror also expresses reluctance to serve on the jury, the defendant's motion to strike the juror from the panel for cause should ordinarily be granted.

Any doubt the court might have regarding the impartiality of a juror must be resolved in favor of the party seeking to strike the potential juror. *State v. West*, 157 W.Va. 209, 200 S.E.2d 859, 866 (1973).

■ In the case now before us, the potential jurors, Albers and Heyl, were both equivocal and hesitant in their answers to the question of whether they could follow the court's instructions to the jury. They advised the court that they were biased against malpractice suits and that, regardless of the court's instructions regarding mental anguish, they did not believe it would change their opinion that the plaintiff should not be permitted damages for mental pain and suffering. Thus, the potential jurors' eventual agreement that they would follow the law was compromised by their earlier prejudices.

■ After admitting prejudice to an issue central to the outcome of the case, it is impossible for that juror to negate that prejudice by merely stating that they would follow the law as instructed by the court. A jury comprised of jurors who do not believe in a certain type of damages, yet reluctantly agree that they will follow

law to the contrary, does not constitute an impartial jury as envisioned by this Court in *State v. Matney*, 176 W.Va. 667, 346 S.E.2d 818, 822 (1986). In *Matney*, we acknowledged that the purpose of the voir dire process was to identify jurors who are not only free from prejudice, but also free from "the suspicion of prejudice." *Id.* (Citations omitted.) Thus, we agree with the appellants' contention that they were entitled to have the two jurors struck for cause.

## II.

■ In reversing this case, we also find error in the use of the *Dye v. Corbin* instruction in connection with Dr. Neal's responsibility in this case. The instruction in question reads as follows:

> If in the diagnosis and treatment of a patient such as Bryan Davis, a physician exercises ordinary skill and care, while keeping within recognized and approved methods, he is not liable for a result which may flow from a mere mistake of reasonable and honest judgment on his part. Therefore, if you believe from a preponderance of all the evidence in this case that Drs. Neal and Arthurs did exercise ordinary skill and judgment in their care of Bryan Davis and that the death of Bryan Davis was a consequence of an error of judgment on their part, then your verdict should be for the defendants, Drs. Neal and Arthurs and the West Virginia Board of Regents.

In *Dye v. Corbin*, 59 W.Va. 266, 53 S.E. 147 (1906), this Court set the standard for an instruction which is used when one party believes that an error in judgment, rath-

---

need not always be taken to be conclusive. It may frequently become necessary for the trial court or counsel to go into particular matters which may be the subject of biased or prejudiced views in order to determine whether the juror in fact, even without his own knowledge, may have a demonstrable bias or prejudice which would operate to the disadvantage of one of the litigating parties.
*Id.,* 170 W.Va. at 11, 289 S.E.2d at 218.

7. We have noted that the fact that the jurors in question were eventually removed from the jury

panel by the use of peremptory strikes is not relevant to the decision. Citing *State v. Wilcox*, 169 W.Va. 142, 286 S.E.2d 257, 258–59 (1982), this Court noted in *Bennett* that:

> It is not disputed that a criminal defendant in a felony trial is entitled to exercise six peremptory strikes against a panel of twenty jurors who are free from challenge for cause under common law. Under this rule, it is reversible error to deny a valid challenge for cause even if the disqualified juror is later struck by a peremptory challenge.

*Bennett*, 181 W.Va. at 272, 382 S.E.2d at 325.

er than negligence, occurred. In *Dye*, the Court held that "where a physician exercises ordinary skill and diligence, keeping within recognized and approved methods, he is not liable for the result of a mere mistake of judgment. A physician is liable for the result of error of judgment, where the error is so gross as to be inconsistent with the degree of skill which it is the duty of a physician to possess." *Id.*, 59 W.Va. at 273, 53 S.E. at 150.

The appellants contend that neither their evidence nor Dr. Neal's would support a theory that a mere mistake of judgment occurred in this case. The appellants contend that the error was gross and that the child received grossly inadequate treatment from Dr. Neal, the attending physician and head of the Department of Pediatrics. Dr. Neal contends that his limited involvement in the child's actual treatment comported with the standard of care for an attending physician in a teaching hospital.

We agree with the appellants' position on the instruction as it applied to Dr. Neal. The evidence presented below reveals that, although he was the attending physician, Dr. Neal could not recall if he actually examined the patient. Further, evidence was presented that makes it uncertain whether Dr. Neal ever reviewed Bryan's chart in its entirety. Thus, although the *Dye* instruction is proper with regard to Dr. Arthurs, we do not believe that it should have been given for Dr. Neal.

Accordingly, after reviewing the evidence presented in the trial below, we reverse the verdict of the Circuit Court of Ohio County and remand for a new trial consistent with this opinion.

Reversed and remanded with directions.