457 S.E.2d 494

Laurence DUPUY and Sheila Dupuy, Plaintiffs Below, Appellants,

v.

Earl D. ALLARA, Defendant Below, Appellee.

No. 22219.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 24, 1995.

Decided April 14, 1995.

---

David P. Greenberg, Susan K. Paugh, Greenberg & Scales, Martinsburg, for appellants.

William H. Martin, Charles Town, for appellee.

FRED L. FOX, II, Judge:[1]

The appellants, Laurence and Sheila Dupuy, filed a civil suit against the appellee, Earl D. Allara, M.D., seeking damages for alleged medical malpractice. On 17 December 1992, a jury returned a verdict for Dr. Allara and awarded no damages to the appellants. By final order dated 14 May 1993, the Circuit Court of Jefferson County, West Virginia, denied the appellants' motion for a new trial. The appellants now appeal from this order, contending the trial court improperly instructed the jury, erred by denying the appellants' motion to strike for cause certain jurors, and abused its discretion by allowing a thirteen-day mid-trial recess.

The record before us reveals the following facts. On 31 March 1989, Laurence Dupuy went to see his family physician, Dr. Allara, after experiencing flu-like symptoms of fever, cold chills, night sweats, and fatigue for several days. Dr. Allara diagnosed Mr. Dupuy as having a simple upper respiratory infection and prescribed a medication called Cipro.

Mr. Dupuy returned to Dr. Allara on 17 April 1989 with worsening symptoms, including headaches, drenching night sweats, fever, chills, and fatigue. At this time, Dr. Allara diagnosed Type A influenza, a simple viral infection, and gave Mr. Dupuy a prescription for a one-week course of an antibiotic known as Amantadine.

---

1. Pursuant to an administrative order entered by this Court on 18 November 1994, the Honorable Fred L. Fox, II, Judge of the Sixteenth Judicial Circuit, was assigned to sit as a member of the West Virginia Supreme Court of Appeals commencing 1 January 1995 and continuing through 31 March 1995, because of the physical incapacity of Justice W.T. Brotherton, Jr. On 14 February 1995 a subsequent administrative order extended this assignment until further order of said Court.

Mr. Dupuy broke his foot on 27 April 1989, and he was treated at the Jefferson Memorial Hospital emergency room. His pulse and temperature were normal at this time.

After several weeks passed with no improvement in his condition, Mr. Dupuy sought additional medical assistance on 8 May 1989, and was examined by Dr. Robert Bowen in the emergency room at City Hospital, Inc., in Martinsburg, West Virginia. Dr. Bowen suspected Mr. Dupuy had either pneumonia or endocarditis, and ordered a blood culture, which was positive for subacute bacterial endocarditis. Dr. Bowen began an antibiotic therapy.

On 14 May 1989, Mr. Dupuy's aortic valve ruptured, and he was transported by ambulance from City Hospital, Inc., to Georgetown University Hospital, where he underwent an emergency aortic heart valve replacement. Because Mr. Dupuy was close to death, there was not enough time to prepare him for the preferred replacement heart valve, and a porcine (pig) valve was used.

Mr. Dupuy developed endocarditis again in November, 1989, and he underwent a second aortic valve replacement at Georgetown University Hospital. A human allograft valve was used this time. Mr. Dupuy, a racehorse jockey, was off work for approximately fifteen months. He returned to riding in August, 1990.

The appellants contend that a correct and timely diagnosis and treatment by Dr. Allara would have prevented the cardiac failure and its consequences.

We now consider the appellants' two assignments of error relating to the trial court's instruction of the jury. First, the appellants argue the trial court erred in instructing the jury that "if ... a physician exercises ordinary skill and care while keeping within recognized and approved methods,

he is not liable for a result which may flow from a mere mistake of reasonable and honest judgment on his part...."[2]

We find this instruction correctly states the law on this point. " '[A]n instruction is proper if it is a correct statement of the law and if there is sufficient evidence offered at trial to support it.' Syllabus point 5, *Jenrett v. Smith*, 173 W.Va. 325, 315 S.E.2d 583 (1983)." Syllabus point 4, *Horan v. Turnpike Ford, Inc.*, 189 W.Va. 621, 433 S.E.2d 559 (1993). "In *Dye v. Corbin*, 59 W.Va. 266, 53 S.E. 147 (1906), this Court set the standard for an instruction which is used when one party believes that an error in judgment, rather than negligence, occurred." *Davis v. Wang*, 184 W.Va. 222, 226–27, 400 S.E.2d 230, 234–35 (1990). In syllabus point 6, the *Dye* Court held:

Where a physician exercises ordinary skill and diligence, keeping within recognized and approved methods, he is not liable for the result of a mere mistake of judgment.

*Dye*, 53 S.E. at 150. The *Dye* instruction is virtually identical to the Defendant's Instruction No. 26 given in this case.

This Court found error in the use of the *Dye* instruction in *Davis v. Wang, supra*, in which a jury returned a verdict for the defendant hospital and physicians, finding they were not negligent in a medical malpractice action for the death of the plaintiff's five-month-old son. On appeal, the plaintiffs alleged error because the instruction exonerated the attending physician for a mere mistake of judgment. This instruction stated:

If in the diagnosis and treatment of a patient such as Bryan Davis, a physician exercises ordinary skill and care, while keeping within recognized and approved methods, he is not liable for a result which may flow from a mere mistake of reasonable and honest judgment on his part.

2. Over the appellants' objection, the lower court gave Defendant's Instruction No. 26, which stated:

The Court instructs the jury that if in the diagnosis and treatment of a patient, such as Laurence Dupuy, a physician exercises ordinary skill and care while keeping within recognized and approved methods, he is not liable for a result which may flow from a mere

mistake of reasonable and honest judgment on his part. Therefore, if you believe from a preponderance of all of the evidence in this case that Dr. Allara did exercise ordinary skill and judgment in his care of Laurence Dupuy and the injuries suffered by Laurence Dupuy were the consequence of an error of judgment on Dr. Allara's part, then your verdict may be for the Defendant, Dr. Allara.

Therefore, if you believe from a preponderance of all the evidence in this case that Drs. Neal and Arthurs did exercise ordinary skill and judgment in their care of Bryan Davis and that the death of Bryan Davis was a consequence of an error of judgment on their part, then your verdict should be for the defendants, Drs. Neal and Arthurs and the West Virginia Board of Regents.

The plaintiffs in *Davis* argued that neither their evidence nor the evidence presented by the attending physician supported a theory that the failure to diagnose the child's illness was a mere mistake of judgment. The plaintiffs argued that the error was gross, and that the child received grossly inadequate treatment from the attending physician, Dr. Neal, who was also the head of the Department of Pediatrics. Dr. Neal maintained that his limited involvement in the child's actual treatment comported with the standard of care for an attending physician in a teaching hospital. *Id.* 184 W.Va. at 227, 400 S.E.2d at 235.

This Court agreed with the plaintiffs' argument that the *Dye* instruction should not have been given for Dr. Neal. "The evidence presented below reveals that, although he was the attending physician, Dr. Neal could not recall if he actually examined the patient. Further, evidence was presented which makes it uncertain whether Dr. Neal ever reviewed Bryan's chart in its entirety." *Id.*

However, in *Davis* this Court also concluded that the *Dye* instruction, which permits a jury to exonerate a doctor for a mere mistake of judgment, was a proper instruction for the resident on duty, Dr. Arthurs, who examined the child, treated him, and failed to diagnose Kawasaki's disease. *Id.*

In the case now before us, the appellants allege that Dr. Allara committed malpractice arising from alleged negligent acts or omissions in misdiagnosing Mr. Dupuy as having an upper respiratory infection instead of subacute bacterial endocarditis. However, Dr. Allara argues that he presented evidence at trial which tended to show that, at most, his

was but "a mere mistake of judgment." For example, one of his experts, Dr. William Miller, testified that "many physicians in this particular situation would not have diagnosed the illness under these circumstances," and that "endocarditis can be difficult to diagnose." Dr. Raymond Hoare, a cardiologist and internist who also testified as an expert for Dr. Allara, stated that because the telltale sign of endocarditis, a heart murmur, was not present in Mr. Dupuy, it was not even an error in judgment on Dr. Allara's part to not prescribe blood tests on his second visit.

Unlike the situation in *Davis*, where it was doubtful that Dr. Neal ever examined the patient or reviewed his chart, the record now before us indicates Dr. Allara presented evidence at trial to support the theory that he committed a mistake or error in judgment, rather than negligence. Consequently, we find no error in the lower court's decision to give Defendant's Instruction No. 26.

The appellants also object to Defendant's Instruction No. 25, which was read to the jury over the appellants' objection.[3] The appellants argue this instruction implies Mr. Dupuy "had some duty to act to mitigate his damages." The appellee disagrees and argues "Mr. Dupuy did not exercise reasonable or ordinary care for his own welfare when he failed to comply with Dr. Allara's instructions, i.e., he was negligent and that his own negligence caused his resultant injury and damages." The instruction in question stated:

It is the duty of the patient to follow reasonable instructions given to him by the practitioner undertaking his care and treatment. If you find that the injury complained of in this case resulted from failure of the patient to comply with this duty and was in no way attributable to any deviation from the required standards of care and skill of the Defendant, then your verdict may be for the Defendant.

3. The appellants also assert errors related to various other jury instructions which either were or were not given. After careful review of the record, we find these arguments to be without merit and conclude the jury was adequately and properly instructed as to the issues presented in this case.

The instruction conforms to the law set forth by this Court in *Lawson v. Conaway*, 37 W.Va. 159, 162, 16 S.E. 564, 567 (1892), in which we recognized that "[i]t is the duty of the patient to cooperate with the physician, and to conform to his prescriptions and directions, and if he neglect[s] to do so he cannot hold the physician responsible for the consequences of his own neglect." At trial, Dr. Allara testified that when Mr. Dupuy saw him on 31 March and 17 April 1989, he instructed Mr. Dupuy to return if the prescribed medication was ineffective. Dr. Allara also stated that Mr. Dupuy did not provide him with accurate information about his symptoms—chills, high fever, and night sweats—during his office visits on 31 March and 17 April. Mr. Dupuy did not contact Dr. Allara again after the 17 April office visit, but Dr. Allara testified that if he had, "I would have probably run some blood work and got a chest x-ray on him."

We conclude that Defendant's Instruction No. 25 is a proper statement of the law in West Virginia and was supported by evidence presented at trial.

Next, the appellants argue the trial court erred by denying the appellants' motion to strike three prospective jurors for cause. The appellants moved to strike two of the prospective jurors because of their contacts with doctors involved in the case and, in the third instance, the motion to strike for cause was predicated on the juror's contact with the medical profession in general.

It is a fact of life that in many rural jurisdictions in this State, a limited number of physicians may practice within any given community. These doctors, as a rule, treat patients throughout the community. When one of these doctors is a party or a witness in a medical malpractice action, it is unlikely the court can seat a panel of jurors with absolutely no contacts with the doctor.

■ Courts have consistently recognized these circumstances by holding that, when empaneling a jury, the primary question is whether a prospective juror is free from bias or prejudice. Relevant, but of lesser importance, are the questions of whether the prospective juror knows the doctor or whether the juror or a member of his family has been a patient of the doctor. If the court, through proper voir dire, can make a determination the prospective juror is free from bias or prejudice, then the juror is not disqualified, and a strike for cause is not in order. Indeed, in syllabus point 3 of *Livengood v. Kerr*, 182 W.Va. 681, 391 S.E.2d 371 (1990), this Court held that "'[w]here a physician-patient relationship exists between a party to litigation and a prospective juror, *although such prospective juror is not disqualified per se*, special care should be taken by the trial judge to ascertain, pursuant to *W.Va.Code*, 56-6-12 (1931), that such prospective juror is free from bias or prejudice.' Syl. pt. 2, *West Virginia Dep't of Highways v. Fisher*, 170 W.Va. 7, 289 S.E.2d 213 (1982)." (Emphasis added.)

After reviewing the record in this case, we are satisfied the trial court took "special care" and determined that each of these prospective jurors was free from bias or prejudice.

■ First, the appellants contend that Angela Barry should have been disqualified for cause because she was once a patient of the appellee, Dr. Allara, and "... the likelihood of bias or prejudice is inherent due to the nature of the juror's ongoing relationship with [Dr. Allara]...." During in-chambers voir dire of Angela Barry, the judge asked her about Dr. Allara: "Is he—do you consider him to be your family doctor?" She responded, "No." When asked whether she believed she had a bias in Dr. Allara's favor because of her prior experience with him, Ms. Barry said, "I don't know. It depends on what the situation is." The judge then explained the need to pick jurors who "will make a decision based upon the evidence and the law, and not on any extraneous factors ... would your previous contact with him affect your ability to render a fair and impartial verdict based on the evidence?" Ms. Barry answered, "No, not really. Because most of the time that he's seen me was like for school stuff. Because he does most of the school physicals and stuff." Ms. Barry later explained that "the last time he might have treated me for like school stuff was like about eight or nine years ago, I believe."

Counsel subsequently asked Ms. Barry to clarify what she meant when, in response to questions about whether anything associated with her treatment by Dr. Allara might bias her in this case, she said, "It depends...." Ms. Barry replied, "I said depends—I said depends when you said bias because I didn't know exactly what he was talking about." Ms. Barry was then asked if she was biased against Dr. Allara, and she said, "No, I don't have anything against him."

The trial judge refused to strike Ms. Barry, finding that "[s]he said basically that she can render a fair verdict based upon the law and the evidence ... You know, her willingness to go back to him [Dr. Allara] is based upon her apparently not having any prejudice against him. Not so much on her endorsement."

■ The appellants also argue that Lewis Lloyd should have been struck for cause because his wife had a physician-patient relationship with Dr. William Miller, who was one of Dr. Allara's expert witnesses. The appellants state that Mr. Lloyd indicated on voir dire he was satisfied with Dr. Miller's treatment of his wife. From this, the appellants conclude that Mr. Lloyd "obviously trusted Dr. Miller enough to encourage his wife to continue to treat with [Dr. Miller]."

A closer examination of the transcript of Mr. Lloyd's individual voir dire reveals he first told the court he had "no opinion" as to Dr. Allara's background or his profession. He then said his wife had recently been treated "a number of times for bronchitis" by Dr. Miller. Mr. Lloyd said he knew Dr. Miller "by sight," but "as far as a friend or having a personal relationship, I do not have a personal opinion about his practice." It is true Mr. Lloyd said he was satisfied with the care Dr. Miller had given his wife, but when he was then asked "if Dr. Miller expresses an opinion in this case, would that in itself—the relationship you and your wife have with him, give you more of a feeling that you know to give more credence to what he says?", Mr. Lloyd stated unequivocably, "Absolutely not." Mr. Lloyd explained he worked as a manager for a local industry and was part of a panel that heard sexual harassment complaints for sixteen years: "And in a working environment of 350 people, you tend to form some type of friendship. Laying those feelings aside when you make decisions is much more difficult than a casual acquaintance with a doctor."

After an in-chambers individual voir dire of Mr. Lloyd, counsel argued he should be struck because "... it is quite obvious now that the whole panel here is going to be Dr. Allara's patients or Dr. Miller's patients. And I think there is a point when it gets to the cumulative effect that we've got a biased jury."

The trial court rejected the appellants' cumulative effect argument, correctly pointing out that "we have to look at these things from the standpoint of each individual juror and how they respond to voir dire." The trial court refused to strike Mr. Lloyd for cause, concluding that "if this gentleman is true to his word, he sounds like he is going to be a dynamite juror for both sides." However, the appellants exercised a preemptory strike and removed Mr. Lloyd from the jury.

■ The final juror the appellants' counsel moved to strike for cause was Paul Tan. The appellants state that because Mr. Tan worked in his father's ophthalmology practice, "the Court imposed a great burden on Mr. Tan by asking him to stand in judgment of one of his father's colleagues knowing that a verdict against [Dr. Allara] would be well known among the local medical community." Following individual voir dire of Mr. Tan, the appellants' counsel asked that he be disqualified because he worked in his doctor/father's office, and physicians have a financial incentive to keep the cost of malpractice insurance down. The court found Mr. Tan was asked legitimate questions about his attitudes toward malpractice suits and that Mr. Tan indicated he had no personal beliefs which would influence him one way or the other. Thus, the court deemed him a qualified juror.

At one point during the trial, Mr. Tan experienced a sudden nose bleed. The court took a recess, and Dr. William Miller, the aforementioned expert witness for Dr. Allara, went to the restroom to see if Mr. Tan needed help. Dr. Miller spoke briefly with Mr. Tan, who wetted a towel, put it on his

nose, and laid his head back in a chair. Dr. Miller asked if he was all right and if he had nose bleeds often, and Mr. Tan responded affirmatively to both questions. Dr. Miller then left the restroom.

The court inquired about Mr. Tan's condition and told him he could be replaced by an alternate juror if he did not feel like continuing. Mr. Tan indicated he did not have transportation to get home, and said, "I should be okay this afternoon...." The court asked Mr. Tan if his contact with Dr. Miller would affect his judgment on the case. Mr. Tan replied, "No," and the court allowed Mr. Tan to continue as a juror.

The appellants now argue that "[t]he cumulative effect of this incident, together with the juror's family relationship with a physician, created a great likelihood of bias on the behalf of Mr. Tan in favor of [Dr. Allara]." However, as we indicated above, we are satisfied that the individual in-chambers voir dire of prospective jurors Barry, Lloyd, and Tan did not elicit sufficient doubt about their ability to be impartial as to warrant striking them for cause. "The decision as to whether to grant a defendant's motion to strike jurors for cause rests within the sound discretion of the trial court." *State v. King*, 183 W.Va. 440, 451, 396 S.E.2d 402, 413 (1990). We find no abuse of discretion by the trial court in its rulings on these three jurors.

Finally, the appellants contend the trial court erred by recessing the trial on 4 December 1992 and not resuming it until 17 December 1992. The appellants argue the thirteen-day recess was "excessively long" and occurred at a point favoring Dr. Allara because his case-in-chief was presented after the recess and was foremost in the jurors' minds when they began deliberations.

The trial began on 1 December 1992 and continued through 4 December 1992, but then recessed pending completion of previously scheduled criminal cases.[4] The jurors were presented with the options of trying to complete the trial by staying later on the

evening of Friday, 4 December 1992, coming in on Saturday, 5 December 1992, or coming back on a day or days later in the month. By a majority vote, the jury expressed a preference for finishing at a later date.

■■■■ Ordering a recess or temporary adjournment is within the sound discretion of the trial court. In syllabus point 8 of *State v. Richey*, 171 W.Va. 342, 298 S.E.2d 879 (1982), this Court explained that "[a] trial court has considerable discretion as to matters involving the length of a recess or temporary adjournment of a trial." More recently, in syllabus point 2 of *Nutter v. Maynard*, 183 W.Va. 247, 395 S.E.2d 491 (1990), we reiterated that "[i]t is well settled as a general rule that the question of continuance is in the sound discretion of the trial court, which will not be reviewed by the appellate court, except in case it clearly appears that such discretion has been abused.' Syl. Pt. 1, *Levy v. Scottish Union & National Ins. Co.*, 58 W.Va. 546, 52 S.E. 449 (1905)."

In *Richey, supra*, the trial was recessed for the Christmas holidays, from Thursday evening, 20 December, to Wednesday morning, 26 December. The defendant argued the recess interrupted the continuity of his case and could have caused jurors to forget details of the testimony. *Id.* 298 S.E.2d at 890. The trial court's reason for the recess was that a number of civil matters had already been scheduled for hearing on Friday, and the judge did not feel those hearings should be postponed because of the length of time they had been on the docket. The judge also considered that Monday was Christmas Eve, and decided the jury should not have to serve that day. *Id.*

The *Richey* Court concluded the trial court did not abuse its discretion in declaring the recess, recalling the general principle " 'that a trial court is accorded a considerable discretion in the trial of the case in order to handle the manifold exigencies that may arise. *State v. Hankish*, 147 W.Va. 123, 126 S.E.2d 42 (1962); *State v. Justice*, 135 W.Va.

---

4. The trial judge explained to the jurors, "The difficulty is, ladies and gentlemen, that I have—I have to go to Berkeley Springs next week to try some criminal cases. At least one of these involves what we call the speedy trial rule. That is

an incarcerated individual who's demanded trial at this term of court. And this term of court in Morgan County goes out at the end of the month. And so this is business that absolutely has to be taken care of."

852, 65 S.E.2d 743 (1951); *State v. Hamrick,* 112 W.Va. 157, 163 S.E. 868 (1932).'" *Richey,* 298 S.E.2d at 890.

 In determining whether a trial court has abused its discretion by granting a recess or temporary adjournment during the trial of a case, this Court will examine the following factors: (1) the prejudice to the complaining party or parties; (2) the reasons necessitating the recess or temporary adjournment; (3) whether there were alternatives available to avoid the interruption of the proceedings; and (4) the length of the recess or temporary adjournment. If the record clearly demonstrates that the complaining party was not prejudiced by the delay, then it may be unnecessary to examine the remaining three factors.

After carefully considering all of the above, we conclude there is no evidence to suggest the trial judge clearly abused the considerable discretion he is accorded to deal with exigencies such as that which arose in this case. His presence was required at a previously scheduled criminal trial in another county, and this was a legitimate reason for recessing the trial.[5] The trial judge explored alternatives such as Friday night and Saturday sessions, but the jurors rejected these options. However, the trial judge kept counsel apprised of his situation, and asked jurors to keep their schedules clear so they could be ready to continue at a moment's notice. While this recess was of significant length, and any delay at all should be avoided whenever possible, we cannot find that its length alone rendered the verdict suspect. Most significantly, the appellants are hard pressed to show any prejudice to their case. Their assertion that the jury heard the doctor's case after the recess and it was foremost in their minds is balanced by the fact that the jury had only the plaintiff's case to think about during the thirteen-day recess. We find no reversible error on this point.

After careful consideration of the record in the proceedings below, we find no reversible error in this case. Therefore, the 14 May 1993 final order of the Circuit Court of Jefferson County, West Virginia, is hereby affirmed.

Affirmed.

BROTHERTON, J., did not participate.

FOX, Judge, sitting by temporary assignment.

---

5. Rule 2 of the Rules for Resolution of Court Scheduling Conflicts states:
    In resolving scheduling conflicts the following priorities should ordinarily prevail: (a) appellate cases should prevail over trial cases; (b) *criminal felony trials should prevail over civil trials;* (c) cases in which the trial date has been first set (by published calendar, order or notice) should take precedence over cases which were set later; (d) trials should prevail over hearings, and hearings should prevail over conferences; and, (e) trials and hearings of a judge in travel status should prevail over trials and hearings of a judge sitting in residence. (Emphasis added.)