543 S.E.2d 320

Pamela S. PLEASANTS as Administratrix of the Estate of Jennifer Lynn Pleasants, deceased, Plaintiff Below, Appellant,

v.

ALLIANCE CORPORATION, a West Virginia corporation, Defendant Below, Appellee.

No. 27663.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 20, 2000.

Decided Dec. 12, 2000.

Concurring and Dissenting Opinion of Justice Starcher Jan. 10, 2001.

Robert V. Berthold, Jr. Esquire, Tony L. O'Dell, Esquire, Berthold, Tiano & O'Dell, Charleston, for Appellant.

Stephen D. Annand, Esquire, Roberta F. Green, Esquire, Shuman, McCuskey & Slicer, Charleston, for Appellee.

SCOTT, Justice:

The estate of Jennifer Pleasants, a fifteen-year-old who died within ten hours of leaving the emergency room of Women and Children's Hospital in Charleston, West Virginia, after presenting herself for treatment with

gastritis-type symptoms, appeals from a defense verdict. The assignments of error upon which Appellant relies include: (1) the trial court's failure to permit a hearing on whether a juror gave false answers during voir dire; (2) an equal protection violation resulting from allegations that Appellees [1] purposefully eliminated females from the jury panel; (3) an improper verdict form and various instructional errors; and (4) Appellees' presentation of cumulative and unfairly prejudicial expert testimony on the standard of care issue. After carefully examining these issues in conjunction with the record submitted, we find no prejudicial error and accordingly, affirm.

### I. Factual and Procedural Background

On December 15, 1995, Jennifer Pleasants sought treatment at Women and Children's Hospital for severe stomach pain. She was treated by Dr. Daniel Prudich, an employee of Appellee Alliance Corporation, and discharged within two hours of her arrival after being diagnosed with gastroenteritis.[2] Within a matter of hours of her return home, Jennifer died. Following her death, it was discovered that Jennifer had a rare disease called phlegmonous gastritis. This disease, which is caused by a colonization of bacteria that ultimately causes a hole in the stomach, requires treatment of antibiotics and surgical resectioning of the infected areas of the stomach.

At trial, Appellees argued that given the rarity of this type of infection, Dr. Prudich could not have been expected to make a correct diagnosis. According to Appellant,[3] she did not base her theory of malpractice on the failure to promptly and accurately diagnose the rare disease, but instead on Appellees' failure to keep Jennifer at the hospital for further observation and administration of intravenous fluids. After deliberating for

three days, the jury returned a defense verdict. Appellant seeks a reversal of the lower court's denial of her motion for a new trial based upon the above-delineated assignments of error.

### II. Discussion

#### A. Voir Dire

■ Appellant contends that the lower court committed reversible error by failing to hold a hearing on the issue of whether the jury foreman, Leon Clements, falsely responded to certain voir dire inquiries. During the course of voir dire, the following questions were asked concerning the jurors' involvement in the insurance business or in claims adjustment:

Q. Anybody else work for an insurance industry, insurance company as an agent, adjuster, claims person? There are several of you already said you did.

Anybody else work for a company that's in the business of adjusting or claims? Yes, ma'am?

JUROR: I work for State Farm Insurance.

. . . .

Q. Anybody else work for a company in sales, adjusting, claims, work for any insurance company?

JUROR: Is that past or present?

Q. Present.

Any complaints, anybody in the business of claims, Workers' Compensation or unemployment compensation or work for the government or work for a private industry or agency that resolves or works or investigates claims or adjusts claims or works in claims in any way? . . . .

---

1. Appellant brought suit against both Charleston Area Medical Center and Alliance Corporation, but voluntarily dismissed CAMC after the verdict. For purposes of this opinion, we find it necessary to sometimes refer to Appellees, rather than Appellee, because Appellant has couched the assignments of error collectively against both Alliance and CAMC.

2. In common parlance, this means a stomach virus.

3. Because a very limited portion of the trial transcript has been transcribed and submitted to this Court, we do not have the benefit of a full review of the trial proceedings. The only portion of the trial transcript that this Court has been provided with includes sections pertaining to voir dire, jury instructions, and the hearing on the new trial motion.

With the exception of the juror who indicated that she worked for State Farm, no other jurors responded to these questions.

On the second day of the jury's deliberations,[4] Appellant sought a hearing for the purpose of resolving whether juror Clements had truthfully responded to the above-delineated voir dire. After hearing arguments of counsel on this issue, the lower court denied Appellant's request for a hearing.[5] Citing this Court's ruling in *West Virginia Human Rights Commission v. Tenpin Lounge, Inc.,* 158 W.Va. 349, 211 S.E.2d 349 (1975), Appellant maintains that the lower court erred in not holding a hearing on this issue of voir dire truthfulness.[6]

█ In syllabus point two of *Tenpin Lounge,* we held that: "Upon an allegation before a trial court that a juror falsely answered a *material* question on *voir dire,* and where a request is made for a hearing to determine the truth or falsity of such allegation it is reversible error for the trial court to refuse such hearing." *Id.* at 349–50, 211 S.E.2d at 350. Our holding in *Tenpin Lounge* requires reversal upon a denial of the requested hearing only when there is an allegation that a juror falsely answered a material question.[7] Careful examination of the questions put to juror Clements during

voir dire does not reveal that he testified falsely to any material question. Because the query concerning employment "for a company in sales, adjusting, claims" was expressly limited to present employment, Mr. Clements, a retired UPS employee, cannot be said to have answered the question untruthfully. Giving Appellant the benefit of the doubt on the issue of whether Mr. Clements' prior employment in the safety department of UPS[8] even comes within the scope of the question, we still see no evidence of untruthful testimony given the express limitation to present employment.[9] Since the factual predicate of a falsely answered material question was never established, we conclude that it was not reversible error for the trial court to have refused to hold a hearing on this issue. *See id.* at 349–50, 211 S.E.2d at 350, syl. pt. 2.

### B. Gender–Based Juror Exclusion

█ Both federal and state law preclude exclusion of potential jurors based on gender discrimination. *See J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994); Syl. Pt. 3, *Parham v. Horace Mann Ins. Co.,* 200 W.Va. 609, 490 S.E.2d 696 (1997). We held in syllabus point

---

4. Appellant's counsel apparently discovered, in talking with another lawyer, that Mr. Clements had disclosed in a case tried one week earlier before Judge Kaufman (*Katdare v. Logan*) that he had previously worked for UPS as an accident investigator.

5. The trial court indicated, however, that counsel could renew this issue post-trial.

6. The trial court determined that, rather than interrupting the deliberations, he would order the voir dire to be transcribed for purposes of determining whether any false testimony had been given by Mr. Clements. The trial court, in ruling on Appellant's new trial motion, commented on how, in contrast to the situation in *Tenpin Lounge,* the issue of false testimony was not ignored. Here, the trial court noted "there was a lot of discussion [about] ... how it was going to be handled" including "an in camera hearing ... in chambers, with counsel present, on the record." The trial court further indicated that upon transcription, Appellant's voir dire concern proved "harmless" based on Mr. Clement's responses.

7. While there is no question that a party's failure to request the type of hearing envisioned by

*Tenpin Lounge* prevents them from raising the issue on appeal, the mere request for such a hearing, absent the necessary factual showing of false testimony, does not entitle a party to a reversible error finding. *See McGlone v. Superior Trucking Co.,* 178 W.Va. 659, 668, 363 S.E.2d 736, 745 (1987) (stating that reliance on *Tenpin Lounge* was misplaced since no request for hearing on juror testimony was made); *State v. Banjoman,* 178 W.Va. 311, 318, 359 S.E.2d 331, 338 (1987) (finding that party, by failing to request hearing, had failed to preserve objection as to allegedly false voir dire answers).

8. His former employment as part of management in the UPS safety department required him to investigate an accident and decide whether UPS could charge the driver with an avoidable or an unavoidable accident. During the final moments of the hearing on its new trial motion, Appellant represented that Mr. Clements also investigated claims where there was damage to a package.

9. Appellant's counsel could have requested that the trial court expand the inquiry to include past employment in these fields of employment.

four of *Payne v. Gundy*, 196 W.Va. 82, 468 S.E.2d 335 (1996), that

It is a violation of the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States and article III, section 10, of the Constitution of West Virginia for a party in a civil action to purposefully eliminate potential jurors from a jury through the use of peremptory strikes solely upon the basis of gender.

Appellant maintains that Appellees wrongly excluded all of the females who were included in the jury panel. Of the fifteen jurors who comprised the final jury group, seven of these individuals were women. One of these seven females was struck for cause and of the remaining six women, Appellees struck five of these individuals. Appellant struck the remaining female from the panel.

 In the seminal decision of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court established the framework for determining whether a peremptory strike was used for a discriminatory purpose. 476 U.S. at 80, 106 S.Ct. 1712. We adopted this three-step process in syllabus point one of *Parham:*

To prove a violation of equal protection, the analytical framework established in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), involves three steps. First, there must be a prima facie case of improper discrimination. Second, if a prima facie case is shown, the striking party must offer a neutral explanation for making the strike. Third, if a neutral explanation is given, the trial court must determine whether the opponent of the strike has proved purposeful discrimination. So long as the reasons given in step two are facially valid, the explanation for the strike need not be persuasive or plausible. The persuasiveness of the explanation does not become relevant until the third step when the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination.

200 W.Va. at 611, 490 S.E.2d at 698.

 Unlike the voir dire issue where the trial court did not hold the hearing requested by counsel, a hearing in conformity with the precepts of both *Batson* and *Parham* was held. Although the lower court engaged in the required three-step process, Appellant urges this Court to find that the lower court abused its discretion in ruling that "gender was not a factor in jury selection and that all persons were give[n] a full opportunity to participate in the system regardless of their gender."[10] Acknowledging that Appellees complied with step two of the *Batson/Parham* test by offering seemingly nondiscriminatory reasons for their strikes, Appellant maintains that these reasons are both "fishy" and "pretext[ual]." Appellant suggests that, notwithstanding the facially neutral explanations offered, Appellees engaged in purposeful elimination of jurors based on their gender.

The reasons offered by Appellees in explanation of the challenged strikes included prior litigation history; prior juror duty;[11] follower-type personality;[12] socioeconomic reasons;[13] uncomfortable eye contact;[14] and a pending malpractice suit.[15] This Court made clear in *Parham* that the strik-

10. This ruling is included in the trial court's order entered on August 2, 1999.

11. This particular juror had previously found in favor of the prosecution in a criminal case. According to defense counsel, the prevailing theory is that this is indicative of an individual who might be more inclined to rule in a plaintiff's favor.

12. During the *Batson/Parham* hearing, counsel indicated that this juror was struck based on the fact that her employment as a "cashier at Big Lots" indicated that "she would not be a strong juror."

13. With regard to one juror, the concern expressed was that since she was unemployed and had a husband employed as a "blue collar" worker, she might not "gain an appreciation of some of the medical issues involved in this case."

14. The female client representative for CAMC reported to counsel that she was uncomfortable keeping one juror on the panel given the eye contact between herself and the juror.

15. Another female juror that was struck, Judith McHugh, appears to be the wife of former Supreme Court Justice Thomas McHugh.

ing party's explanation of the challenged strikes "need not be persuasive or plausible." 200 W.Va. at 614, 490 S.E.2d at 701. The only requirement in step two of the process is that the reasons given must be "facially valid." [16] *Id.* Even Appellant concedes that Appellees complied with this requirement of demonstrating facial validity. It is step three of the *Batson/Parham* process to which Appellant assigns error: the trial court's ultimate decision that Appellees had not engaged in purposeful gender discrimination.

In syllabus point four of *Parham* we ruled that "[u]pon review, this Court will afford great weight to a trial court's findings as to whether a peremptory strike was used to advance racial or sexual discrimination." 200 W.Va. at 611, 490 S.E.2d at 698. The reason for treating "the trial court's decision on the ultimate question of discriminatory intent" as "a finding of fact of the sort accorded great deference on appeal," is "because ... the finding 'largely will turn on evaluation of credibility.'" *Hernandez v. New York,* 500 U.S. 352, 364–65, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (quoting, in part, *Batson,* 476 U.S. at 98 n. 21, 106 S.Ct. 1712). Explaining further, the United States Supreme Court stated,

> In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the

... [attorney's] state of mind based on demeanor and credibility lies "peculiarly within a trial judge's province."

*Hernandez,* 500 U.S. at 365, 111 S.Ct. 1859 (quoting *Wainwright v. Witt,* 469 U.S. 412, 428, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985)). Since the issue of intentional discrimination, as acknowledged by the high court in *Batson,*[17] is essentially a credibility issue, we afford trial courts "substantial discretion in determining whether the reasons articulated by the striking party are merely pretextual." *Parham,* 200 W.Va. at 615, 490 S.E.2d at 702 (citing *State v. Rahman,* 199 W.Va. 144, 159, 483 S.E.2d 273, 288 (1996) (Cleckley, J., concurring)).[18]

We reject Appellant's suggestion that the rights sought to be protected by *Batson* and its progeny "become illusory" when a striking party is permitted to offer "fishy pretexts" in response to a challenged strike. Applying its *Batson* decision, the United States Supreme Court resolved this issue in *Purkett v. Elem,* 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam), by reversing the United States Court of Appeals for the Eighth Circuit based on its improper merging of steps two and three of the *Batson* process. Faulting the appellate court for "requiring that the justification tendered at the second step be not just neutral but also at least minimally persuasive," *Purkett,* 514 U.S. at 768, 115 S.Ct. 1769, the Supreme Court clarified what it meant by requiring the striking party to offer a "'legitimate reason'" in explanation of the challenged strike. *Id.* (quoting *Batson,* 476 U.S. at 98 n. 20, 106 S.Ct. 1712, quoting *Texas Dep't of Community Affairs*

**16.** Employing the language used by the high court in *Purkett v. Elem,* 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam), Justice Cleckley observed in his concurrence to *State v. Rahman,* 199 W.Va. 144, 483 S.E.2d 273 (1996), that "[s]o long as the step (2) explanation is race neutral, it does not matter that it is 'silly or superstitious.'" *Id.* at 158, 483 S.E.2d at 287 (Cleckley, J., concurring) (quoting *Purkett,* 514 U.S. at 768, 115 S.Ct. 1769).

**17.** 476 U.S. at 98 n. 21, 106 S.Ct. 1712.

**18.** Since credibility is the key to either accepting or rejecting the proffered explanation, this Court cannot conceive of a test that we could establish

for determining whether the trial court erred in accepting the facially valid reason for the strike, except to require that such decision will be reviewed under an abuse of discretion standard. *But see Purkett,* 514 U.S. at 776, 115 S.Ct. 1769 (Stevens, J., dissenting) (advocating "rule giving the appeals court discretion, based on the sufficiency of the record, to evaluate a prosecutor's explanation of his strikes"). Given the lack of opportunity to instantaneously assess both the demeanor of counsel and the demeanor of the potential jurors, we are without the necessary factual predicate to find an abuse of discretion with regard to the lower court's ruling on this issue.

*v. Burdine,* 450 U.S. 248, 258, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). "What it means by a 'legitimate reason' is not a reason that makes sense, but a reason that does not deny equal protection." 514 U.S. at 769, 115 S.Ct. 1769. Applying this standard to the justification offered in *Purkett,* the Court found the prosecutor's proffered explanation—long, unkempt hair, a mustache, and a beard—to be "race neutral" and to satisfy the "step two burden of articulating a nondiscriminatory reason for the strike." *Id.* at 769, 115 S.Ct. 1769. Critically, as the Supreme Court recognized in *Purkett:* "It is not until the *third* step that the persuasiveness of the justification becomes relevant—. . . At that stage, implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Id.* at 768, 115 S.Ct. 1769; *see also Rahman,* 199 W.Va. at 159, 483 S.E.2d at 288 (Cleckley, J., concurring) (stating that "I do not believe that *Purkett's* acceptance of a facially neutral explanation, even if implausible or fantastic, sounds the death knell for *Batson* in all but the most flagrant cases").

Peremptory challenges have been recognized as " 'one of the most important of the rights' " in our judicial system. *Batson,* 476 U.S. at 120, 106 S.Ct. 1712 (Burger, J., dissenting) (quoting *Swain v. Alabama,* 380 U.S. 202, 219, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965)). As discussed by Justice Burger in his dissent to *Batson,* "peremptory challenges are often lodged, of necessity, for reasons 'normally thought irrelevant to legal proceedings or official action, namely, . . . religion, nationality, occupation or affiliations of people summoned for jury duty.' " 476 U.S. at 123, 106 S.Ct. 1712 (quoting *Swain,* 380 U.S. at 220, 85 S.Ct. 824). Like it or not, the peremptory challenge system inherently involves the elimination of jurors based on perceived biases and, given the limited biographical information available to counsel, it is necessarily founded on assumptions, hunches, and intuition. *See* 476 U.S. at 123, 106 S.Ct. 1712. Recognizing that peremptory challenges serve to strengthen our jury system, the dissenters [19] to *Batson* observed:

"The peremptory, made without giving any reason, avoids trafficking in the core of truth in most common stereotypes . . . . Common human experience, common sense, psychosociological studies, and public opinion polls tell us that it is likely that certain classes of people statistically have predispositions that would make them inappropriate jurors for particular kinds of cases. . . . [W]e have evolved in the peremptory challenge a system that allows the covert expression of what we dare not say but know is true more often than not."

476 U.S. at 121, 106 S.Ct. 1712 (Burger, J., dissenting) (quoting Babcock, *Voir Dire: Preserving "Its Wonderful Power,"* 27 Stan. L.Rev. 545, 553–54 (1975)). As the Supreme Court observed in *Swain,*

The function of the [peremptory] challenge is not only to eliminate extremes of partiality on both sides, but to assure the parties that the jurors before whom they try the case will decide on the basis of the evidence placed before them, and not otherwise. In this way the peremptory satisfies the rule that "to perform its high function in the best way 'justice must satisfy the appearance of justice.' " *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 [1955]. Indeed the very availability of peremptories allows counsel to ascertain the possibility of bias through probing questions on *voir dire* and facilitates the exercise of challenges for cause by removing the fear of incurring a juror's hostility through examination and challenge for cause.

380 U.S. at 219–20, 85 S.Ct. 824.

■ Provided the strike has not been made on a discriminatory basis, the underlying reason for a peremptory challenge is not subject to further inquiry. *See Purkett,* 514 U.S. at 769, 115 S.Ct. 1769. And, while we are loathe to condone, even indirectly, any purposeful exclusion of jurors based on gender, we have no evidence before us from which we can make a determination that the strikes at issue were made on a discriminatory basis. Accordingly, we conclude that the lower court did not abuse its discretion in

19. Justice Rehnquist joined Chief Justice Burger in his dissent to *Batson.*

ruling that "gender was not a factor in jury selection."

## C. Verdict Form/Jury Instructions

### 1. Proximate Causation

■ Appellant contends that error resulted through the lower court's refusal to include the "increased risk of harm" alternative to proving proximate cause on the jury verdict form. *See Thornton v. Charleston Area Medical Center*, 172 W.Va. 360, 305 S.E.2d 316 (1983). Appellant does not dispute that the jury was clearly instructed on the various methods of proving causation.[20] Appellee Alliance notes that the entire headnote nine of *Thornton*[21] was read as part of the proximate causation charge. Our review of the verdict form indicates that the jury was properly questioned as to the elements of its verdict. Accordingly, we find no error associated with the omission of the alternate methods of proof for proximate causation from the verdict form.

### 2. Multiple Methods of Treatment

■ Appellant maintains that the lower court erred in giving the "multiple methods of treatment" instruction[22] since the evidence at trial established that the only method for Jennifer's medical condition was a combination of antibiotics and surgical resection. In approaching the treatment issue as relating solely to the post-death diagnosis, Appellant confuses the issue surrounding the giving of this particular instruction. There was evidence at trial that phlegmonous gastritis is a very rare medical condition and even Appellant concedes the difficulty of properly diagnosing this condition, acknowledging in its brief: "The plaintiff never argued that Dr. Prudich should have diagnosed phlegmonous gastritis specifically." The patient presented with abdominal pain of unknown etiology and upon both a physical examination, which revealed not even mild abdominal tenderness and no associated peritoneal findings, and a series of tests (blood cell count, urine, temperature), the diagnosis rendered was gastritis, or a stomach virus. Both parties' expert witnesses were in agreement that Jennifer's stomach did not rupture during the time she was under observation in the emergency room.

Appellant's theory of liability was based upon Appellees' failure to keep Jennifer at the hospital for further observation, rather than the inability to properly diagnose her condition.[23] Had Jennifer been at the hospital, Appellant argues that the unmistakable signs of peritonitis would have been observed and surgery would have resulted which would have saved her life. Appellees argued to the jury that Dr. Prudich gave Jennifer's mother the option of taking her daughter home after the conclusion of the examination or permitting her to remain in the emergency room for additional observation. The decision was made to return home and Jennifer left the hospital with instructions that she

20. The trial court instructed the jury that Appellant's cause of action was provable by negligence that directly causes death and by acts or omissions that increase the risk of harm which was a substantial factor in bringing about the patient's death.

21. That headnote reads: "Where a plaintiff in a malpractice case has demonstrated that a defendant's acts or omissions have increased [the] risk of harm to plaintiff and that such increased risk of harm was a substantial factor in bringing about ultimate injury to plaintiff, then defendant is liable for such ultimate injury." *See Thornton*, 172 W.Va. at 361, 305 S.E.2d at 317.

22. That instruction read as follows:

A health care provider is not negligent if it selects one of several or more approved methods of treatment within the standard of care. In other words, if there is more than one generally recognized method of diagnosis or treatment and no one method is used exclusively or uniformly, a health care provider is not negligent if, in the exercise of medical judgment, it selects one of the approved methods within the standard of care—even if you believe in retrospect that the alternative chosen may have not been the best method of treatment—as long as it utilizes that method of treatment in a non-negligent manner as otherwise instructed by the Court.

23. Appellant suggests that the high white blood cell count alone should have been enough to require Jennifer to remain at the hospital. Appellees' expert witness, Dr. Ronald L. Nichols, testified at trial that the emergency room test results showed "temperature normal, pulse normal, respirations normal, ... blood pressure normal [,and] ... that the BUN, which easily goes up and down with dehydration, was normal."

was to be watched closely for the next two to four hours and to return to the hospital as indicated by the abdominal pain sheet.

At trial, the jury heard expert testimony confirming that the symptoms Jennifer presented with at the emergency room were consistent with garden variety gastritis. The jury also heard testimony that there are different tests and different drugs that might be ordered for a patient presenting with abdominal symptoms such as Jennifer.[24] We disagree with Appellant's suggestion that the jury may have been misled, based on the giving of the "multiple methods of treatment" instruction, into believing that Dr. Prudich utilized a recognized treatment for phlegmonous gastritis. From the evidence presented at trial, the jury was clearly informed that the correct diagnosis was not made until after Jennifer's death. What the "multiple methods of treatment" instruction did was to advise the jury that there is not just one recognized method of treating a patient who presents with the gastritis symptoms that Jennifer had. We find no error in the giving of this instruction as the evidence before the jury supported such an instruction.[25]

D. Mistake of Judgment Instruction

Appellant argues that in giving a "mistake of judgment" instruction the jury was subject to being confused and misled.[26] The instruction at issue read as follows:

A health care provider who exercises ordinary skill and care while keeping within recognized and approved methods within the standard of care is not negligent because of a reasonable and honest mistake of judgment. A physician is liable for the result of error of judgment where the error is so gross as to be inconsistent with the degree of skill which it's the duty of the physician to possess.

This instruction has its origins in a decision issued by this Court in *Dye v. Corbin*, 59 W.Va. 266, 53 S.E. 147 (1906). *Corbin* concerned the issue of a physician's negligence in treating an ankle injury, subsequently determined to involve broken bones, with a splint and cast, at a time when x-rays were seldom used. We held in *Corbin* that:

Where a physician exercises ordinary skill and diligence, keeping within recognized and approved methods, he is not liable for the result of a mere mistake of judgment. A physician is liable for the result of error of judgment, where such error is so gross as to be inconsistent with the degree of skill which it is the duty of a physician to possess.

*Id.* at 266, 53 S.E. at 148, syl. pts 6 and 7.

This Court upheld the use of *Corbin*-type instructions in *Davis v. Wang*, 184 W.Va. 222, 400 S.E.2d 230 (1990). In *Davis*, we found that the giving of such an instruction was proper as to one of two treating physicians and reversible error as to the second physician. As to the physician who could not even remember if he actually examined the patient and whether he examined the patient's entire medical chart, we disapproved the giving of the *Corbin* instruction. *Id.* at 227, 400 S.E.2d at 235. What this Court did in *Wang* was to determine that, because the medical treatment given by the second doctor was grossly inadequate under established standard of care levels, the "mistake of judgment" was inapplicable to the issue of such doctor's commission of negligence.

More recently, in *Dupuy v. Allara*, 193 W.Va. 557, 457 S.E.2d 494 (1995), this Court again examined, and approved, the giving of a "mistake of judgment" instruction where the plaintiffs asserted that a correct and timely diagnosis would have prevented cardiac failure and its consequences. In *Allara*, we pointed out that in *Wang* this Court sanctioned the use of such an instruction for the resident doctor who examined the child, treated him, and failed to diagnose Kawaski's

---

24. Among those additional tests and procedures suggested by Appellant were x-rays, a pelvic examination, and/or a rectal examination.

25. Appellant does not raise any substantive error in connection with the giving of this instruction, only that the evidence was not consistent with such instruction.

26. Appellant objected to the giving of a "mistake of judgment" instruction at trial based on its potential for confusion, stating that it "seems to indicate that you can make a mistake as long as it's an honest mistake." On appeal, Appellant argues that the instruction should not have been given based on lack of evidence.

disease. *Id.* at 561, 457 S.E.2d at 498. In upholding the giving of the "mistake of judgment" instruction in *Allara*, this Court focused on the fact that evidence was admitted at trial that " 'many physicians in this particular situation would not have diagnosed the illness under these circumstances,' and that 'endocarditis can be difficult to diagnose.' " *Id.*

In examining case law from other jurisdictions, it is clear that a movement has begun towards eradication of certain language typically contained in "mistake of judgment" or "error of judgment" instructions or elimination of those instructions in their entirety. Those courts that have rejected use of a "mistake of judgment" instruction have done so based on the inclusion of adjectival terms such as "honest," "bona fide," "good faith," or "best" in reference to the issue of a physician's exercise of judgment.[27] The theory underlying the disapproval of such terms is that they wrongly inject subjectivity into what is otherwise viewed as an objective standard of care issue. *See generally* Joseph H. King, Jr., *Reconciling the Exercise of Judgment and the Objective Standard of Care in Medical Malpractice*, 52 Okla. L.Rev. 49 (1999). Courts and commentators have been troubled by the potential for jury confusion through the suggestion that, if the doctor in his own mind was making the

---

**27.** *See Shumaker v. Johnson,* 571 So.2d 991, 994–95 (Ala.1990) (rejecting use of "good faith" mistake in judgment instruction based on possibility of juror confusion and extending ruling to instructions couched in terms of "honest mistake" or "bona fide error"); *Logan v. Greenwich Hosp. Ass'n,* 191 Conn. 282, 465 A.2d 294, 303 (1983) (disapproving "bona fide error in judgment" instruction because of implication that only errors in judgment made in bad faith can be actionable); *Riggins v. Mauriello,* 603 A.2d 827, 830–31 (Del.Supr.Ct.1992) (holding that "mere error of judgment" language impermissibly permits jury to conclude that physician is not liable for malpractice despite negligent administration of medical treatment); *Veliz v. American Hosp., Inc.,* 414 So.2d 226, 227–28 (Fla.Dist.Ct.App.1982) (rejecting use of "honest errors of judgment" language in defining nurse's negligence); *Leazer v. Kiefer,* 120 Idaho 902, 821 P.2d 957, 964–67 (1991) (reversing on grounds that "error in judgment" instruction implied that liability can be escaped through physician's exercise of "best judgment" in diagnosing and treating patient); *Peters ex rel. Peters v. Vander Kooi,* 494 N.W.2d 708, 711–13 (Iowa 1993) (disapproving instructions addressing standard of care in terms of "honest error of judgment" as wrongful comments on evidence); *Ouellette ex rel. Ouellette v. Subak,* 391 N.W.2d 810, 813–16 (Minn.1986) (concluding that "mostly subjective 'honest error in judgment' language is inappropriate in defining scope of the professional's duty" but refusing to reject use of "honest error" rule on grounds that where "there are two methods of treatment for a particular medical condition, both accepted by the medical profession, ... the doctor's choice of either is, ordinarily, not negligence"); *Parodi v. Washoe Med. Ctr., Inc.,* 111 Nev. 365, 892 P.2d 588, 591 (1995) (finding error in giving of "error in judgment" instruction phrased in terms of exercise of "best judgment" and identifying "growing number of courts that have rejected error-in-judgment instruction"); *Wall v. Stout,* 310 N.C. 184, 311 S.E.2d 571, 577 (1984) (holding that defining physician's liability for medical negligence in terms of "honest error" is potentially misleading and therefore inappropriate); *Kurzner v. Sanders,* 89 Ohio App.3d 674, 627 N.E.2d 564, 568–69 (1993) (ruling that "honest error or mistake in judgment" instruction was prejudicial as it conflicted with objective standard of care); *Rogers v. Meridian Park Hosp.,* 307 Or. 612, 772 P.2d 929, 932–33 (1989) (rejecting use of "reasonable judgment" where varying treatment options exist and further viewing as confusing the excusal from liability where physician acts with reasonable care and skill in exercising such judgment); *DiFranco v. Klein,* 657 A.2d 145, 147–48 (R.I.1995) (rejecting use of "good faith" in "error in judgment" instruction, but upholding use of such instructions as valid statement of physician's liability for choosing an acceptable method of treatment that later proves to be unsuccessful); *Shamburger v. Behrens,* 380 N.W.2d 659, 663 (S.D.1986) (finding that use of "good faith error in judgment" language in instruction was confusing); *Rooney v. Medical Ctr. Hosp.,* 162 Vt. 513, 649 A.2d 756, 760–61 (1994) (finding error in use of "best judgment" and "mere error of judgment" instruction since statutorily-defined standard of care is stated in objective terms); *Teh Len Chu v. Fairfax Emergency Medical Assocs.,* 223 Va. 383, 290 S.E.2d 820, 822 (1982) (holding that terms such as "bona fide error" or "honest mistake" have no place in instructions dealing with negligence in medical malpractice actions); *Watson v. Hockett,* 107 Wash.2d 158, 727 P.2d 669, 673–74 (1986) (ruling that use of word "honest" should be stricken because it imparts argumentative aspect to jury charges on standard of care, but otherwise approving "error in judgment" instruction where physician "is confronted with a choice among competing therapeutic techniques or among medical diagnoses"); *Kobos ex rel. Kobos v. Everts,* 768 P.2d 534, 536–39 (Wyo.1989) (disavowing use of "honest judgment" in terms of defining physician's standard of care, but noting that "error of judgment" charge may be appropriate where alternate treatment exists).

"best" judgment regarding a method of treatment, the jury might be wrongly persuaded to find in the doctor's favor even though that subjective "best" judgment was in fact below accepted standard of care levels. Put another way, some courts view such instructions as problematic because they "erroneously imply[ ] that only dishonest or bad-faith· deviations from the applicable standard of care constitute actionable negligence." *DiFranco v. Klein,* 657 A.2d 145, 148 (R.I. 1995).[28]

■ While the "mistake of judgment" instruction is still recognized as valid by various states,[29] we find that courts increasingly are veering away from the use of these instructions based on the potential for jury confusion. Upon a reexamination of this issue, we are convinced that the instruction has little use in the face of legislative enactments such as West Virginia Code § 55–7B–3 (2000), which define the necessary elements for proving a. medical malpractice cause of action. Given the possibility for juror confusion arising from the use of subjective terms

such as "honest," and "gross," we hold that the "mistake of judgment" jury instruction, which this Court first approved in *Corbin,* wrongly injects subjectivity into an objective standard of care; is argumentative and misleading; and should no longer be used to instruct the jury concerning the relevant standard of care in a medical malpractice action. Accordingly, we hereby overrule *Dye v. Corbin,* and its progeny, insofar as those cases approve the giving of a "mistake of judgment" instruction.[30] 59 W.Va. 266, 53 S.E. 147.

■ Despite our decision to overrule *Corbin,* we do not find reversible error on the basis of the giving of the "mistake of judgment" instruction in this case. Since the remaining instructions properly advised the jury regarding the elements necessary to prove a case of medical malpractice, we find the giving of the instruction to be harmless error. Other appellate courts have similarly concluded that a new trial is not required following the giving of a "mistake of judgment" instruction, which the court subse-

**28.** One court has opined that this view only results when the "mistake of judgment" language is taken out of context. *Morlino v. Medical Ctr.,* 152 N.J. 563, 706 A.2d 721, 734 (1998).

**29.** *See e.g., Hunsaker v. Bozeman Deaconess Found.,* 179 Mont. 305, 588 P.2d 493, 506–07 (Mont.1978) (approving instruction that "an unsuccessful effort, a mistake, or an error in judgment is not necessarily negligent"); *Morlino,* 706 A.2d at 730–34 (refusing to excise "mistake of judgment" from model jury charge for standard of care in medical malpractice cases and discussing continued validity of allowing jury to consider physician's "judgment" provided such evaluation is without reference to concepts of "good faith" and "honesty"); *Brault v. Kenmore Mercy Hosp.,* 142 A.D.2d 945, 530 N.Y.S.2d 369, 370 (N.Y.App.Div.1988) (affirming use of "error of judgment" instruction where evidence presented that "treating physician, in the exercise of his professional judgment, chose among several medically acceptable courses of treatment"); *Graham v. Keuchel,* 847 P.2d 342, 356 (Okla. 1993) (refusing to rule that "mistake of judgment" instructions are impermissible and finding only that instruction should not have been given based on lack of evidence concerning "choice of several alternatives, equally acceptable medically"); *Roach v. Hockey,* 53 Or.App. 710, 634 P.2d 249, 252 (1981) (approving "mistake of judgment" instruction and stating that "it is clear that a physician is not liable for an error of

judgment where there is a reasonable doubt or a difference of opinion as to the nature of the patient's condition or the proper course of treatment and the physician acts with reasonable care and skill in exercising that judgment"); *Havasy v. Resnick,* 415 Pa.Super. 480, 609 A.2d 1326, 1335–36 (1992) (upholding "mistake of judgment" instruction and explaining that "instruction was appropriate because of expert testimony that compartment syndrome is often difficult to diagnose early"); *Fitzgerald v. Vincent,* 85 Wash. App. 1078, 1997 WL 199055 at *9 (Wash.Ct.App. 1997) (finding that "error of judgment instruction may be used to supplement the standard of care instruction and should be given with caution and 'be limited to situations where the doctor is confronted with a choice among competing therapeutic techniques or among medical diagnoses' ") (quoting *Watson,* 727 P.2d at 674).

**30.** The author of this opinion, separate from the majority, believes that, upon extraction of the subjective terms currently used in "mistake of judgment" instructions, the instruction should still be valid. In assessing the negligence of a physician, the jury should be apprised as to the conditions under which the physician made his or her decision regarding treatment and the jury, in making its determination of whether the physician deviated from the standard of care, should consider the facts available to the treating physician at the time of treatment. In my opinion, a "mistake of judgment" instruction, devoid of subjective terms, serves this purpose.

quently finds to be in error, provided the remainder of the charge correctly stated the standard for proving negligence. *See Baker v. Werner*, 654 P.2d 263, 268 (Alaska 1982) (holding that any error in giving "mistake of judgment" instruction was harmless since remaining instructions correctly informed jury regarding standard against which to evaluate physician's conduct); *Morlino v. Medical Ctr.*, 152 N.J. 563, 706 A.2d 721, 734 (1998) (affirming judgment notwithstanding use of "mistake of judgment" instruction based on fact that "charge as a whole . . . clarifies that a deviation from the standard of care is negligence").

### D. Cumulative Evidence

■ The final error asserted by Appellant involves the late disclosure of a standard of care expert. After the January 30, 1998, agreed-upon deadline for Appellees to disclose experts had passed, Appellee Alliance disclosed Dr. David Seidler on August 19, 1998, as a potential expert regarding the credentialing of Dr. Prudich. Twelve days later, Appellee Alliance disclosed that it was naming Dr. Seidler as a standard of care expert in addition to the previously disclosed Dr. Richard Braen.

Appellant argues that the trial court erred in permitting Dr. Seidler to testify as to the standard of care since his disclosure was not made until seven months after the agreed-upon deadline. In addition, Appellant contends that the jury was wrongly permitted to hear cumulative evidence on standard of care since the jury heard the testimony of both Dr. Seidler and Dr. Braen on this issue.

■ With regard to the late disclosure of Dr. Seidler as a standard of care expert,[31] Appellee Alliance disputes that prejudice resulted through the late disclosure due to the fact that Appellant deposed Dr. Seidler twice in the intervening six month period before the trial date. While this Court does not condone noncompliance by any party with

discovery deadlines, we agree with the trial court's decision that scheduling orders were not meant to be used in a punitive fashion to prevent one party from adapting their case strategy to fit a plaintiff's altered theory of the case.[32] Since Appellant clearly was not surprised by the testimony of Dr. Seidler, we find no prejudice based on the late disclosure. Concerning Appellant's contention that she was prejudiced by the cumulative effect of two experts testifying as to standard of care, we are without a proper factual basis from which to assess this assignment because a trial transcript relevant to this issue has not been provided to this Court.[33] Accordingly, we find no error regarding the testimony of Dr. Seidler.

Based on the foregoing, the decision of the Circuit Court of Kanawha County is hereby affirmed.

Affirmed.

STARCHER, Justice, concurring in part and dissenting in part.

(Filed Jan. 10, 2001)

I concur with the majority's recognition, in Syllabus Point 5, that the giving of a "mistake of judgment" instruction in a medical malpractice case—or any case—is fertile ground for jury confusion. A juror's attention should be focused on the essential elements of the action: did the defendant doctor owe the plaintiff a duty of due care, and did the defendant breach that duty? The question "did the doctor make an honest mistake?" wrongly adds subjectivity to what is supposed to be an objective duty of care.

The instruction also suggests that a lesser duty of care exists for medical providers. While the average citizen can be held liable for not being careful under the given circumstances, a "mistake of judgment" instruction implies that a doctor's conduct could be excused if the doctor made an "honest mis-

---

31. Appellee Alliance states in explanation of this late disclosure that Dr. Seidler was not asked to "serve as an 'independent standard of care expert,'" but to testify to the standards Dr. Seidler developed for the care to be given by Alliance physicians in situations such as the type of abdominal pain with which Jennifer presented.

32. Appellee Alliance represents that not until September 3, 1998, did Appellant officially raise issues of training, education, hiring, and staffing.

33. *See supra* note 3.

take." A juror could infer from the instruction that a doctor can only be held liable for making a "dishonest" mistake—which I guess would mean making a mistake and then lying about it—or for intentionally harming the patient.

If a driver "honestly" just didn't see that a stoplight was red because he was adjusting the radio and drove through the light, hitting another car and injuring its occupants, and the driver admits that "whoops, I made a mistake," should we excuse the driver's carelessness? Should we excuse the driver's judgment call to adjust the radio knob rather than watch the road? Of course not. The driver's "mistake of judgment" in not paying attention to traffic signals cannot absolve the driver for any liability. This same rule should apply to the medical profession. I therefore concur in the majority opinion's rejection of the "mistake of judgment" instruction in Syllabus Point 5.

That being said, I dissent to the remainder of the majority's opinion.

The jury panel in this case was composed of seven females and eight males. The circuit court removed one female for cause. The defendant in this case exercised his peremptory strikes to remove five of the remaining six women on the jury panel, thereby virtually guaranteeing an all-male jury. The plaintiff correctly characterized this situation as "fishy."

But the majority opinion focused on our holding in Syllabus Point 1 of *Parham v. Horace Mann Ins. Co.*, 200 W.Va. 609, 490 S.E.2d 696 (1997) where we stated that the reasons given by a party for exercising a peremptory strike must only be "facially valid" and "need not be persuasive or plausible." I believe that this statement of law is constitutionally incorrect. The United States Supreme Court has specifically held that, when examining gender-based juror challenges, a party's explanation of a juror challenge "must be based on a juror characteristic other than gender, and the proffered explanation may not be pretextual." *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 145, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994). In other words, the reasons given for a strike cannot be a pretext for discrimination, and must be

plausible. If the reasons given by a party regarding a strike are a pretext for gender discrimination, then the trial judge should reject the party's explanation and go no further in determining whether "the opponent of the strike has carried his burden of proving purposeful discrimination."

"Intentional discrimination on the basis of gender by state actors violates the Equal Protection Clause, particularly where . . . the discrimination serves to ratify and perpetuate invidious, archaic, and overbroad stereotypes about the relative abilities of men and women." *J.E.B.*, 511 U.S. at 131, 114 S.Ct. 1419. Dismissing a female juror because it is perceived that "she would not be a strong juror" or that she might not "gain an appreciation of some of the medical issues involved in this case" appears to ratify and perpetuate archaic, overbroad stereotypes about women. Such discrimination in jury selection "causes harm to the litigants, the community, and the individual jurors who are wrongfully excluded from participation in the judicial process." 511 U.S. at 127, 114 S.Ct. 1419. I believe that the circuit court, by condoning the use of pretextual reasons for striking jurors, and this Court in sustaining that practice, has upheld discrimination harmful to the administration of justice in this State.

I also believe that the circuit court was wrong in refusing to hold a hearing to determine whether the jury foreman responded falsely to questions asked during *voir dire*. The jury panel was asked if any juror was involved in claims adjustment. The jury foreman had previously worked as an accident investigator and claims adjuster for UPS, but did not respond to the question.

We held in Syllabus Point 2 of *West Virginia Human Rights Comm'n v. Tenpin Lounge, Inc.*, 158 W.Va. 349, 211 S.E.2d 349 (1975) that when a party alleges that a juror falsely answered a material question on *voir dire*, and when a party requests a hearing to determine the truth or falsity of the allegation, "it is reversible error for the trial court to refuse such hearing." This holding is quite simple—once a party makes an allegation and requests a hearing, all the circuit court needs to do is take 5 minutes, take the

juror aside in chambers, and ask the juror a few questions to determine whether false statements were made.

The majority opinion takes this simple process and cobbles it up by apparently deciding that a juror's occupation, or former occupation in this case, is not a "material question" during *voir dire.* The majority opinion also reads into our holding in *Tenpin Lounge* a requirement of a "factual predicate of a falsely answered material question" before a trial judge must hold a hearing on whether a juror falsely answered a material question. The circular impossibility of this requirement is obvious: a party often cannot absolutely show a question was falsely answered without a hearing, and under the majority's reasoning, cannot get a hearing without showing a question was falsely answered. (Which, of course, begs the next question: why is a hearing needed if a party can prove a question was falsely answered?)

Because the composition of the jury in this case was fundamentally unfair, I must dissent to the majority opinion. By allowing the jury foreman to apparently falsely answer questions regarding his occupation—an occupation that would have likely caused the plaintiff to strike him from the jury—while simultaneously allowing the defendant to strike women from the jury panel, the circuit court tarnished the jury's verdict in this case, and impaired the impartial appearance that the court system must project in our democratic system. This case should have been reversed and remanded for a new trial—one with a fair, constitutionally sound jury.

In conclusion, I concur with the majority opinion's rejection of the special "mistake of judgment" instruction for the medical profession. I otherwise respectfully dissent, because the parties were deprived of a fair, impartial jury.